No. 25-40194

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

PROVIDENCE TITLE COMPANY,
*Plaintiff – Appellant*,
v.
TRULY TITLE, INCORPORATED; KIM SHEETS-SHEFFIELD; GRAHAM HANKS,
*Defendants – Appellees*

---

On Appeal from the United States District Court
For the Eastern District of Texas; Civil Action No. 4:21-CV-147

---

**BRIEF OF APPELLANT PROVIDENCE TITLE COMPANY**

---

W. Scott Hastings
  State Bar No 24002241
  scott.hastings@troutman.com
Seth M. Roberts
  State Bar No. 24051255
  seth.roberts@troutman.com
Thomas F. Loose
  State Bar No. 12561500
  tom.looose@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

*Counsel for Plaintiff-Appellant Providence Title Company*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

| **Plaintiff-Appellant** | **Counsel for Defendant-Appellee** |
|---|---|
| Providence Title Company | W. Scott Hastings<br>Seth M. Roberts<br>Thomas F. Loose<br>TROUTMAN PEPPER LOCKE LLP<br>2200 Ross Avenue, Suite 2800<br>Dallas, Texas 75201 |

| **Defendants-Appellees** | **Counsel for Defendants-Appellees** |
|---|---|
| Truly Title, Inc. and Graham Hanks | Christopher D. Kratovil<br>John C. Sokatch<br>DYKEMA GOSSETT PLLC<br>1717 Main Street, Suite 4200<br>Dallas, Texas 75201 |

| **Former Parties Not on Appeal** | **Counsel for the Former Parties** |
|---|---|
| Kim Sheets-Sheffield | Russell Devenport<br>Sarah Kline<br>MCDONALD SANDERS, P.C.<br>777 Main Street, Suite 2700<br>Fort Worth, Texas 76102 |
| Tracie Fleming | Byron Henry<br>SCHEEF & STONE, L.L.P.<br>2600 Network Blvd., Suite 400<br>Frisco, Texas 75034<br>Mark Fleming |

*Pro Se*

_/s/ W. Scott Hastings_
W. Scott Hastings
Attorney for Plaintiff-Appellant

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant Providence Title Company ("Providence") requests oral argument. This case has a long procedural history and extensive factual record. Following this Court's affirmance of the district court's injunction against Defendant Tracie Fleming ("Tracie"), *see* Case No. 21-40578, *Providence Title Company v. Fleming*, <u>2023 WL 316138</u> (5th Cir. Jan. 19, 2023), all claims between Providence, on one hand, and Tracie and Mark Fleming ("Mark") have been resolved.[1] Providence subsequently resolved its claims with Kim Sheets-Sheffield ("Sheets").

Providence's claims against Defendants-Appellees Truly Title, Inc. ("Truly") and Graham Hanks ("Hanks") are subject to this appeal. The district court resolved Providence's claims against Appellees through a series of summary judgment orders that are subject to *de novo* review on appeal. The summary judgment record encompasses more than 2,000 pages of briefing and evidence, as most of the defendants chose to file their own summary judgment motions. Providence believes oral argument will help the Court sort through this record and focus attention on the key pieces of evidence that show why it was error to dismiss Providence's claims against Truly and Hanks without a trial.

---

[1] Because the Flemings have the same last name, Providence will refer to them by their first names (Tracie and Mark) for purposes of clarity.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF CONTENTS ........................................................................................ v

TABLE OF AUTHORITIES ............................................................................... viii

INTRODUCTION ................................................................................................... 1

STATEMENT OF JURISDICTION ....................................................................... 2

STATEMENT OF THE ISSUES ............................................................................ 1

STATEMENT OF THE FACTS ............................................................................. 3

A.   Truly's plans to expand into Texas ................................................................. 3

　　　1.   Hanks led Truly's Texas expansion efforts to target Providence. ........ 3

　　　2.   During due diligence and subject to the NDA, Truly identified
　　　　　Providence's top branch offices. ........................................................... 4

　　　3.   The proposed transaction fell apart in late 2019. ................................ 8

B.   Truly changed its strategy to poach rather than purchase Providence
　　　offices ............................................................................................................ 9

　　　1.   Truly ignored its contracts with Providence when it started
　　　　　pursuing Providence offices and employees. ....................................... 9

　　　2.   Tracie engaged in secret, significant plans to poach Providence
　　　　　employees for Truly. ........................................................................... 10

　　　3.   Tracie solicited Mark to join Truly. .................................................. 10

　　　4.   Tracie coordinated Truly's Johnson County operations. .................... 11

　　　5.   Sheets coordinated with Truly to poach Providence's Southlake
　　　　　office ................................................................................................... 13

　　　6.   The Flemings solicited Providence's Johnson County employees
　　　　　to join Truly ........................................................................................ 15

C.    Appellees caused extensive damage to Providence. ....................................18

D.    Procedural background ...................................................................................20

SUMMARY OF THE ARGUMENT ......................................................................21

ARGUMENT ...........................................................................................................23

A.    Standard of Review........................................................................................23

B.    The district court erred when it granted summary judgment to Truly on
      Providence's claim for breach of the NDA. ..................................................25

      1.    There was significant summary judgment evidence establishing
            Truly's breach of the NDA...................................................................25

      2.    The district court's summary judgment analysis conflated the
            breach of NDA claim with Providence's claims for
            misappropriation of trade secrets. .......................................................30

C.    The district court erred when it granted summary judgment to Truly on
      Providence's claim for breach of the non-solicitation agreement.................34

D.    The district court erred when it granted summary judgment to
      Appellees on Providence's claim for knowingly participating in
      breaches of fiduciary duties. .........................................................................39

      1.    Truly and Hanks knowingly participated in Tracie's breaches of
            her fiduciary duties. .............................................................................40

      2.    The district court relied on inapposite authority. ................................46

      3.    The district court erred when it found that Providence Team
            Leaders, Sheets and Mark, did not breach fiduciary duties owed
            to Providence. .......................................................................................49

E.    The district court erred when it granted summary judgment on
      Providence's claim for tortious interference with prospective business
      relations...........................................................................................................54

F.    The district court further erred when it granted summary judgment on
      Providence's conspiracy claim. .....................................................................56

CONCLUSION .......................................................................................................57

CERTIFICATE OF SERVICE ..................................................................59

CERTIFICATE OF COMPLIANCE.......................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*7X Cattle Co. LLC v. Brandstadt*,
  2025 WL 852624 (E.D. Tex. Feb. 28, 2025), *adopted* 2025 WL
  848446 (E.D. Tex. March 18, 2025)..........................................................49, 50

*Abetter Trucking Co. v. Arizpe*,
  113 S.W.3d 503 (Tex. App.—Houston [1st Dist.] 2003, no pet.)...............52, 54

*Matter of Alabama & Dunlavy, Ltd.*,
  983 F.3d 766 (5th Cir. 2020) ...........................................................................58

*Angel, Trustee for Gobsmack Gift Trust v. Tauch*,
  642 S.W.3d 481 (Tex. 2022) ............................................................................36

*Bancroft-Whitney Co. v. Glen*,
  411 P.2d 921 (Cal. 1966)..................................................................................52

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
  590 S.W.3d 471 (Tex. 2019) ............................................................................35

*In re Buescher*,
  783 F.3d 302 (5th Cir. 2015) ...........................................................................24

*CAE Integrated, L.L.C. v. Moov Technologies, Incorporated*,
  44 F.4th 257 (5th Cir. 2022) ..............................................................32, 33, 34

*Caliber Home Loans, Inc. v. Cove*,
  2025 WL 71983 (N.D. Tex. Jan. 10, 2025) .................................................41, 50

*Carroll v. Timmers Chevrolet, Inc.*,
  592 S.W.2d 922 (Tex. 1979) ............................................................................57

*Centennial Bank v. Holmes*,
  717 F. Supp. 3d 542 (N.D. Tex. 2024) .............................................................41

*Christensen v. Sherwood Ins. Servs.*,
  758 S.W.2d 801 (Tex. App.—Texarkana 1988, writ denied) ...........................24

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
  417 S.W.3d 909 (Tex. 2013) ............................................................... 56

*Coker v. Coker*,
  650 S.W.2d 391 (Tex. 1983) ............................................................... 39

*Crossroads Hospice, Inc. v. FC Compassus, LLC*,
  606 S.W.3d 294 (Tex. App.—Houston [1st Dist.] 2020, no pet.),
  *vacated but not withdrawn*, 2020 WL 3866902 (Tex. App.—
  Houston [1st Dist.] July 9, 2020) ............................................ 47, 48, 58

*Davis v. Crawford*,
  700 S.W.3d 438 (Tex. App.—Eastland 2024, no pet.) ...................... 58

*Finley Resources, Inc. v. Headington Royalty, Inc.*,
  672 S.W.3d 332 (Tex. 2023) ............................................................... 35

*GE Betts, Inc. v. Moffitt-Johnston*,
  885 F.3d 318 (5th Cir. 2018) ........................................................ 32, 33

*Graham Mortg. Corp. v. Hall*,
  307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) .......................... 40

*Herider Farms-El Paso, Inc. v. Criswell*,
  519 S.W.2d 473 (Tex. App.—El Paso 1975, writ ref'd n.r.e.) ........... 52

*Ill. Tool Works, Inc. v. Harris*,
  194 S.W.3d 529 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ...... 39

*International Bankers Life Ins. Co. v. Holloway*,
  368 S.W.2d 567 (Tex. 1963) .......................................................... 42, 43

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
  341 S.W.3d 323 (Tex. 2011) ............................................................... 35

*J.M. Davidson, Inc. v. Webster*,
  128 S.W.3d 223 (Tex. 2003) ............................................................... 39

*Johnson v. Brewer & Pritchard, P.C.*,
  73 S.W.3d 193 (Tex. 2002) ................................................................. 51

*Kastner v. Jenkens & Gilchrist, P.C.*,
  231 S.W.3d 571 (Tex. App.—Dallas 2007, no pet.) .......................... 40

*Klinek v. LuxeYard, Inc.*,
    596 S.W.3d 437 (Tex. App.—Houston [14th Dist.] 2020, pet. denied)............58

*Leader's Inst., LLC v. Jackson*,
    2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) ..................................25

*MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*,
    995 S.W.2d 647 (Tex. 1999) ...............................................35

*Meadows v. Hartford Life Ins. Co.*,
    492 F.3d 634 (5th Cir. 2007) ..............................................40

*Navigant Consulting, Inc. v. Wilkinson*,
    508 F.3d 277 (5th Cir. 2007) ......................................41, 51, 52

*Parker Drilling Co. v. Romfor Supply Co.*,
    316 S.W.3d 68 (Tex. App.—Houston [14th Dist.] 2010, pet denied)................36

*Providence Title Company v. Fleming*,
    2023 WL 316138 (5th Cir. Jan. 19, 2023)..........................................iv

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................24

*Reilly v. Rangers Mgmt., Inc.*,
    727 S.W.2d 527 (Tex. 1987) ...............................................39

*Rosetta Res. Operating, LP v. Martin*,
    645 S.W.3d 212 (Tex. 2022) ..............................................39

*Southwestern Energy Production Company v. Berry–Helfand*,
    491 S.W.3d 699 (Tex. 2016) ..............................................32

*State v. Standard Oil Co.*,
    107 S.W.2d 550 (Tex. 1937) ..............................................57

*Stein v. Meachum*,
    748 S.W.2d 516 (Tex. App.—Dallas 1988, no writ)........................................40

*Thomas v. Great Atl. & Pac. Tea Co., Inc.*,
    233 F.3d 326 (5th Cir. 2000) ...................................................24, 25

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ...............................................................57

*Wackman v. Rubsamen*,
602 F.3d 391 (5th Cir. 2010) .............................................................24

*Wal-Mart Stores, Inc. v. Sturges*,
52 S.W.3d 711 (Tex. 2001) ...............................................................56

**STATUTES AND RULES**

28 U.S.C. §1291 ...................................................................................2

28 U.S.C. §1331 ...................................................................................1

28 U.S.C. §1367 ...................................................................................1

FED. R. EVID. 1006 ..............................................................................6

**OTHER AUTHORITIES**

RESTATEMENT (THIRD) OF AGENCY 8.04 cmt. ................................41, 51

W. PROSSER, HANDBOOK OF THE LAW OF TORTS §46 (1971) .................57

**INTRODUCTION**

This case arises out of a failed proposed merger between Providence and Truly in 2019. Truly gained access to all of Providence's confidential information regarding its business, offices, and employees during the merger discussions under a Mutual Non-Disclosure Agreement ("NDA"). After the transaction failed, Truly in a lighting-fast fashion pursued and hired away Providence's president (Tracie), two Providence team leaders (Mark and Sheets), several of Providence's highly profitable offices (in Johnson County and Southlake), and more than 20 employees. In short, Truly and its Texas president, Hanks, knew who to target, which offices to target, and how to move them to Truly. Many of the employees who switched from Providence to Truly even admitted they had never heard of Truly prior to receiving Truly's employment offers. Truly could not (and did not) accomplish its corporate raid without (a) misusing Providence information in violation of the NDA, (b) breaching the non-solicitation agreement Truly agreed to as a condition for receiving detailed office-specific and employee-specific Providence information, and (c) knowingly participating in breaches of fiduciary duties owed to Providence. The district court should not have granted summary judgment.

**STATEMENT OF JURISDICTION**

The district court had subject matter jurisdiction over this case under 28 U.S.C. §§1331 & 1367. After the district court dismissed the federal claims,

ROA.11117-11145, it continued to exercise supplemental jurisdiction over Providence's state law claims. ROA.11272-11274, 11305-11307.

The district court dismissed almost all of Providence's claims against Appellees on summary judgment. ROA.11372-11406. The district court also narrowed Providence's breach of non-solicitation agreement claim against Truly, holding it applied only through May 9, 2020. ROA.11388 at n.9. Thereafter, Providence elected not to pursue that remaining claim, as narrowed by the district court, because Providence's claims against Appellees focus on the second half of 2020 and early 2021. *See* ROA.11455-11461, 11807-11811, 11844-11845.

This Court has appellate jurisdiction under 28 U.S.C. §1291 over Providence's appeal of the final judgment. ROA.11864, ROA.19384, ROA.19398.

## STATEMENT OF THE ISSUES

Whether the district court erred when it granted summary judgment on the following Providence claims:

1.     breach of the NDA provisions barring Truly from using Providence's confidential information for any purpose other than the proposed merger transaction;

2.     breach of the non-solicitation agreement by Truly;

3.     Appellees knowing participating in breaches of fiduciary duties;

4.     Appellees tortious interference with business relationships; and

5.     civil conspiracy.

2

## STATEMENT OF THE FACTS

**A.   TRULY'S PLANS TO EXPAND INTO TEXAS.**

*1.   Hanks led Truly's Texas expansion efforts to target Providence.*

Hanks joined Truly in 2019 to launch Truly's Texas operations.  ROA.9405.

Hanks was friends with Providence's President, Tracie; they wanted to pair up to

form a title industry "dream team."  ROA.9405; ROA.18927.  But Hanks admitted

he did not know much about many of Providence's offices, including in Johnson

County and Southlake.  ROA.9794-9796; ROA.18458-18461.  Nevertheless, Hanks

and Tracie were the people who initiated merger discussions between Providence

and Truly.  ROA.9404-9405; ROA.9478.

Truly believed acquiring Providence would be "a great fit for us."

ROA.18165-18166.  Truly and Providence signed a Letter of Intent ("LOI"), under

which Truly would conduct due diligence with an eye toward acquiring Providence

for $5,000,000, plus a $1,000,000 performance bonus.  ROA.18189-18193.  Both

parties agreed the "purchase price is based primarily on the goodwill, employee

retention and pipeline business."  ROA.18190.  Truly's CEO explained that

"pipeline business" means "repeat business," which makes employee retention so

important:  "It's a repeat business."  ROA.9725.  "[T]he title business is very mobile.

If an employee leaves, the business in most cases goes with it."  ROA.9733.

2.    *During due diligence and subject to the NDA, Truly identified Providence's top branch offices.*

To facilitate the due diligence process, the parties entered into the NDA and a non-solicitation agreement. ROA.9445. The NDA placed strict limits on Truly's ability to use Providence's "Confidential Information," which was defined as "[a]ny information, whether electronic, oral or written," including but not limited to:

> Technical specifications and operating manuals; information relating to and descriptions of current, future, or proposed products and services; financial information; information related to mergers or acquisitions; passwords and security procedures; computer programs, software, and software documentation; customer information and/or prospective client lists; employee information; records; policies; and standards; and trade secrets.

ROA.9446 (emphasis added). Any Confidential Information Truly acquired between April 25, 2019 and April 25, 2021, could be used only to facilitate the contemplated transaction under the LOI. The NDA prohibited Truly from using Providence's information for any other purpose for two years from receipt of such information:

- "Confidential Information is proprietary and confidential to the Discloser and shall be used by the Recipient only for purposes of furthering the Transaction in accordance with the terms of this Agreement."

- "Recipient will only use Confidential Information to advance or enable the Transaction in a manner agreed upon by the Parties. If Recipient receives Confidential Information that is unrelated to the Transaction or disclosed inadvertently, Recipient will not use such Confidential Information for any purpose."

- "Recipient agrees that it shall not make copies of the Confidential Information except as necessary for the Transaction and will not incorporate the content or substance of Confidential Information onto any other media. All copies made, in any medium whatsoever, shall retain all confidential and proprietary

4

markings of the original and shall be covered by the terms and conditions of this Agreement."

- "The term of this Agreement will commence on the Effective Date [April 25, 2019] as stated above and will remain in force through the second (2nd) anniversary of the Effective Date, unless terminated in accordance with provisions of this Agreement."

- "[T]he Recipient's obligations under this Agreement will expire two (2) years after the Recipient's receipt of that Confidential Information unless sooner terminated or superseded by mutual agreement of the parties."

ROA.9446-9447 at ¶¶1, 3, 9 (underline added).  The non-solicitation agreement was entered into via a May 9, 2019 email.  ROA.9442.  Providence's CEO, Dan Foster, told Truly he was:

> happy to provide all information requested but some items provide more info than I would want to give a competitor in the event we don't get a deal done.  As I said, to drill down deeper to offices / employees I would want a one-year non-solicitation to let info get stale.  I believe two years is the norm, but would be satisfied with one.

ROA.9442 (underline added).  Truly's CEO responded:  "[t]his email confirms that Truly Title, Inc. hereby agrees to a one-year non-solicitation of Providence Title employees."  ROA.9442.  Foster understood this agreement to mean that the non-solicitation would end one-year after merger discussions terminated (*i.e.*, "the event we don't get the deal done"), which is consistent with his stated purpose "to let info get stale."  ROA.9442; *see also* ROA.9406 ("When I entered into this agreement with [Truly], it is my understanding that the one-year non-solicitation period began if and when the parties were unable to reach an agreement on a deal.").

Subject to the NDA's protections, Providence gave Truly extensive Confidential Information concerning every aspect of its business, including details about Providence's organization and structure, ROA.18122-18160, employees, compensation, and top performing closers, ROA.9800-9810; ROA.9838-9845; ROA.18456; ROA.18463; ROA.18528-18547; ROA.18598-18604, and benefits, ROA.9811-9613.[2]  Providence's CEO testified: "I think they have everything.  I told Daniel [Providence's CFO] to give them everything they asked for.  And I think they asked for everything, and they got everything."   ROA.10475; *see also* ROA.9406-9407 (cataloging types of information provided).  Providence's CFO confirmed that "I attempted to provide Truly with all information that was requested with the understanding that all information provided would be kept confidential and would not be used against Providence." ROA.9561.  Truly's CEO agreed there was nothing Truly asked for that Providence didn't provide; Providence gave them everything. ROA.9730-9731.  Providence's organization chart showed that *all* of Providence's branch offices reported to Tracie.  ROA.18159.

Providence provided Truly with diligence materials, including office-specific financial information, by uploading them to Box.com in June and July of 2019,

---

[2]    Providence uploaded over 1,500 documents to a Box.com share site, including detailed profit and loss statements, details about its employee compensation structure, and partnership agreements.  ROA.9560-9561; ROA.9589; *see also* ROA.18064-18110 (Rule 1006 summary report of the Providence documents on Truly's Box.com site).

sending emails with monthly and daily updates into November 2021, and providing access to Providence's QuickBook files.[3]  ROA.9560-9561; ROA.9813-9825; ROA.18448-18454; ROA.18546-18544; ROA.18551-18596; ROA.18606-18619. Under the NDA, Truly was prohibited from using this information for any purpose other than the proposed merger transaction (*e.g.*, to pursue Providence's branch locations) through at least November 2021.  ROA.9447.

As part of its diligence, Truly hired a consultant, Chris Cranton, to study Providence's Confidential Information.  ROA.9561.  Cranton prepared a five-year model, identifying Providence locations he forecasted to be profitable (*e.g.*, Johnson County (Burleson, Cleburne, and Old Town), and Southlake), and those he forecasted not to be profitable.  He suggested closing under-performing offices. ROA.9739-9742; ROA.9744; ROA.18200-18201; *see also* ROA.18634 (Johnson County scenario with employees and salary listed).  Cranton recommended delaying the proposed acquisition because the best potential for profitability would not be realized until the end of 2020.  ROA.9745; ROA.18197-18198 ("I do see a path to $2m in profitability, but probably not by the end of 2020….a later closing date is advisable.").  Ultimately, Truly pulled out of the proposed transaction at the end of

---

[3]  Once information was received electronically by Truly, it could be downloaded, printed and distributed anywhere, without tracking.  Truly's Box.com log shows numerous instances in which Providence information was downloaded.  ROA.18164-18184.

2019 and waited until the end of 2020 to poach some of the very locations at the very time Cranton projected them to be more profitable.

    *3.    The proposed transaction fell apart in late 2019.*

Truly viewed Providence's people-first approach as "old" and "staunchy," and thought Providence's CEO had an "emotional attachment" to under-performing branch offices. ROA.9724; ROA.9728-9729. Based on Cranton's analysis (and unbeknown to Providence) Truly planned to scuttle Providence's lower revenue offices, fire Providence employees, outsource much of the actual title work to overseas companies, and isolate Providence's profit centers (*e.g.*, Johnson County and Southlake). ROA.9722-9723; ROA.9728-9729.

When the proposed merger ended, Truly said the sticking point was Foster's request that Truly enter a Master Services Agreement for Ramsey & Foster ("R&F") to provide document preparation services over the next ten years. ROA.9746-9747; ROA.10478-10479. R&F was a law firm run by two of Providence's owners. Tom Berry (a non-retained expert) testified that these kinds of agreements are commonplace in the title industry. ROA.10504-10507 ("Many of the title companies that I've been involved with had a similar relationship between a – the ownership of a title company and the – and a doc-prep firm.").

Foster testified this point had been agreed upon by the parties early in the negotiations. ROA.10478-10479. Truly's Tafoya admitted he was willing to let

R&F continue providing this service "as long as you guys are here." ROA.9746-9747. R&F's document processing fees are "industry standard" and "relatively the same" as what Truly pays its preferred firms for comparable services. ROA.9748. But Tafoya claims he was unwilling to make a ten-year commitment. ROA.9746-9747. Refusing to agree to such a commonplace arrangement was a fabricated justification for Truly to end the negotiations.

## B.    TRULY CHANGED ITS STRATEGY TO POACH RATHER THAN PURCHASE PROVIDENCE OFFICES.

After the proposed merger ended, Hanks adopted a new strategy to expand Truly in Texas:  identify a competitor with significant market share, then "crush" them by "target[ing] their folks."  ROA.10081-10082; ROA.18955.  But for successfully poaching Providence's employees, Truly had no plans to compete head-to-head against Providence in Johnson County and Southlake.  ROA.10054-10057.

### 1.    *Truly ignored its contracts with Providence when it started pursuing Providence offices and employees.*

Hanks began meeting with Tracie in the summer of 2020 to discuss bringing her onboard.  ROA.10022.  Providence's belief and intent was that the non-solicitation agreement was still in place at the time.  ROA.9406.  Providence's intent when entering into the non-solicitation agreement was that it would remain in effect for one year from when the merger discussions between Providence and Truly ended.  ROA.9406 ("When I entered into this agreement with [Truly], it is my

understanding that the one-year non-solicitation period began if and when the parties were unable to reach an agreement on a deal.").

 2.  *Tracie engaged in secret, significant plans to poach Providence employees for Truly.*

In August 2020 (six months before resigning from Providence) Tracie began using a secret, second cell phone to communicate with Hanks because "it was not something that was purely innocent anymore."  ROA.9889-9890.  Tracie did not stop using her secret phone to communicate with Hanks until she joined Truly— when "[i]t was no longer an issue."  ROA.9890; ROA.9917.  During those intervening months, Tracie provided Hanks with confidential financial information for Providence's Johnson County offices, which confirmed Cranton's forecast models.  ROA.9896-9899; ROA.18843; ROA.18850.

Over several months, Tracie and Hanks engaged in detailed conversations and meetings about opening Truly offices.  *See* ROA.9901-9902; ROA.10023; ROA.10068-10069; ROA.19010-19017.  Truly was not planning to compete head-to-head with Providence.  ROA.10054-10057.  Rather, Truly planned to take over Providence's key offices and employees, and their pipeline business—for Truly's, Tracie's, and Hanks' benefit.

 3.  *Tracie solicited Mark to join Truly.*

Tracie solicited Mark and negotiated his contract with Truly, while they were both Providence employees.  ROA.9893-9895; ROA.18814-18815.  Tracie even

10

negotiated Mark's paid time off. ROA.18866. Securing Mark's employment with Truly was key because he was Providence's Team Leader for Johnson County. His team members would follow him when the Flemings resigned suddenly in February 2021. *See* ROA.9903-9906 (listing employees Tracie believed would follow); ROA.18839-18841.

### 4. *Tracie coordinated Truly's Johnson County operations.*

Between November 2020 and February 2021, Tracie had many conversations with Hanks about potential office locations and employees who could move to Truly. ROA.9901-9902; ROA.10023. She visited specific office sites, took pictures, and sent them to Hanks. ROA.10068-10069; ROA.19010-19017. Mark also participated in discussions about, and even physically drove to some, proposed office locations. ROA.9913-9914; ROA.10066; ROA.18885. Although she was Providence's President, Tracie evaluated e-mails from Truly's real estate broker regarding potential offices and lease terms. ROA.9908-9909; ROA.10062-10063; ROA.18823-18837.

Tracie anticipated that many employees would follow her from Providence to Truly, including Peden, Rodrick, Mark, Eberhart, Carpenter, Murray, and Trammel.[4]

---

[4]   Several former Providence employees testified they left Providence to join Truly to follow the Flemings or Sheets. ROA.10272; ROA.10283; ROA.10296-10297; ROA.10308; ROA.10320-10321; ROA.10329; ROA.10354; ROA.10389; ROA.10396-10397; ROA.10406-10407; ROA.10428.

ROA.9903-9906; ROA.18839-18841. Tracie even suggested Truly could sublease Providence's Cleburne office after Providence's employees had been poached. ROA.9911-9912.

The Flemings formally accepted Truly's employment offers in December 2020, but continued working at Providence until February 3, 2021. ROA.8750; ROA.9886. Tracie informed Hanks that she would resign at the end of January, effective immediately, and that Hanks could start talking to Providence's people that weekend. ROA.10075; ROA.19026. Truly made no independent efforts to staff the three offices it was opening in Johnson County. ROA.10073-10076; ROA.19055-19062. Appellees knew they would be staffing those offices with Providence employees. Appellees also knew Tracie was still Providence's President while she was working on plans to help Truly open its new offices with Providence employees. ROA.10067.

Before January 2021, Tracie also learned Truly was actively recruiting Sheets, who was Providence's Team Leader for Southlake and Alliance. ROA.9882-9883; ROA.9915-9916; ROA.18887. Tracie did not disclose this information to Providence. ROA.9938-9939.

Tracie also knew Providence was actively negotiating to sell its business to a third party in late 2020 and early 2021. ROA.9941; ROA.10482-10483. Losing the

12

Johnson County and Southlake offices would greatly impair Providence's chance of a successful sale.

Worse still, at Providence's annual employees review in January 2021, Tracie, Mark, and Sheets did not recommend salary increases for key employees Truly intended to pursue.    ROA.9410-9411;    ROA.9562-9563;    ROA.9935-9936; ROA.10106.    Raises would have been a reason for those employees to stay at Providence.  Tracie's silence about the imminent departures (involving a significant number of employees) violated her duty to not mislead Providence.  And Truly was counting on profiting from that silence to rapidly expand its Texas presence.

5.    *Sheets coordinated with Truly to poach Providence's Southlake office.*

Appellees simultaneously engaged in a similar course of conduct with Sheets, who served as a Providence Team Leader since April 2017.  ROA.10097-10099. When Sheets began speaking with Truly about potential employment in November 2020, she said she hoped she would be able to bring two escrow teams (six people total) from Providence with her.  ROA.10109-10111; ROA.10117.  Appellees, in turn, confirmed they would have office space available for those six people. ROA.10118-10119.  Sheets did nothing to try to help Providence retain her team, even though she was involved in Providence salary discussions.  ROA.10106.

While still a Providence Team Leader, Sheets told Hanks about the number of employees she wanted to bring over, their salary needs, and their technology

preferences.    ROA.10034-10037;    ROA.10063-10064;    ROA.10113-10114;
ROA.10234-10235; ROA.19064; ROA.19070.   She also coordinated with Truly
about facilities and office needs, including working directly with Truly's real estate
broker to find locations for Truly to rent in Southlake and the Alliance area (Ft.
Worth).  ROA.10064-10065; ROA.10115-10116; ROA.18989-18995.

Before leaving Providence, Sheets organized a group job interview for her
entire team to meet Truly's Hanks and Ray Byrns (Truly's recruiter).  ROA.10077;
ROA.10244-10251.   That meeting occurred at a happy hour on February 1, 2021,
which was the day Sheets resigned from Providence.    ROA.10037-10039;
ROA.10119-10125;  ROA.10129-10132.    Everyone at the happy hour accepted
employment with Truly.  ROA.10045.  This was blatant solicitation of Providence's
employees, which Sheets organized before she resigned from Providence, and Hanks
participated in it on behalf of Truly.  Truly had done nothing else to recruit those
employees and none of them had independently sought out Truly.

While Truly and Sheets were working on their plans, Hanks informed Tracie
that Truly was in discussions with Sheets about employment.  ROA.9882-9883;
ROA.9915-9916; ROA.18887.  Shockingly, when Sheets turned in her resignation,
Tracie remained silent, even participating in Providence legal and damage control
strategies as Sheets was on her way out the door.  ROA.9408-9410.

14

Sheets resigned from Providence on February 1, 2021, and began working for Truly that same day. ROA.1017; ROA.10133; ROA.10222. Almost immediately, her team joined Truly. *See* ROA.18114-18121. They then began moving Providence's clients and pipeline business to Truly.[5] At her direction, Sheets' team sent out e-mail solicitations announcing: "Same team, just new company." ROA.10134-10135; ROA.10225-10226. This was an obvious effort to capitalize on Providence's goodwill and reputation ("Same team") to migrate that business to Truly ("new company"). Sheets successfully migrated a significant volume of pipeline business from Providence to Truly. ROA.9411; ROA.10227-10230; ROA.10309-10310; ROA.10322-10323; ROA.10362-10363.

6.   *The Flemings solicited Providence's Johnson County employees to join Truly.*

Two days after Sheets left Providence, the Flemings resigned effective immediately. ROA.9464-66. The Flemings worked throughout the "crazy night" to hire away Providence's Johnson County team. ROA.9927.

On his way out the door, Mark called his team to the Providence parking lot and said: "If you'd like to know where I'm going, you have my cell phone."

---

[5]   Title industry clients include real estate agents, lenders, and other sources of business. ROA.10136-10138. "That's how title companies get money is from referral sources." ROA.10231-10232.

ROA.9976-9977.[6]  He immediately called the other two Johnson County locations (Cleburne and Old Town) to tell them the same thing.   ROA.9978-9981.  Not surprisingly, his team members immediately called him back.  Within four hours of resigning from Providence, Mark had individual cell phone calls with fourteen Providence employees about changing employment.  ROA.9982-9983.  Mark kept a written log of those calls and wrote down personal e-mail addresses where Truly could send its job offers.  ROA.9981; ROA.18912-18913.  Some of these calls lasted only a minute, which suggests the substantive solicitation had already occurred.  ROA.18912-18913.

Mark shared the list with Tracie that night "as it evolved."  ROA.9934-9935.  Tracie took the personal e-mail addresses from Mark's list and combined it with her knowledge of the employees and Providence's pay structure to send with recommendations for job offers that would be attractive to the Providence employees at Truly.  ROA.9918-9919; ROA.9925-9926; ROA.9984-9985; ROA. ROA.10024-10025; ROA.18817-18823; ROA.18905-18913; ROA.18915-18924.  Recruitment of these employees, and using confidential information learned from Providence to do it, was a clear breach of Tracie's fiduciary duties, as Providence's President.  This

---

[6]    Mark testified he did not want to tell his team in Providence's office, so he asked them to step outside to the parking lot.  ROA.9976.

16

also violated many of Providence's employment policies, which Truly had in its possession.[7]  *See* ROA.9481-9557.

Truly used the information Tracie provided, offering to pay slightly more in base salary than Providence in almost every instance.   *See* ROA.9588-9589; ROA.18051-18060 (summary).   Ultimately, the Flemings left Providence with fifteen Johnson County employees, which effectively destroyed three of Providence's branch locations.  ROA.9408.  This was in addition to Sheets and the other Southlake employees.

In the district court, Truly falsely claimed "several Providence at-will employees reached out and expressed a desire to work for Truly."  ROA.8832; ROA.9829-9830.  Providence's former employees testified that Appellees, the Flemings, and Sheets were the moving force behind the mass departure.  Many of the former employees testified they were happy at Providence.  *See, e.g.,* ROA.10333-10336; ROA.10406; ROA.10410-10414.  Several had not taken any steps to leave Providence before receiving Truly's offers.  ROA.10270-10271; ROA.10281-10282;    ROA.10294-10295;    ROA.10307;    ROA.10327-10328;

---

[7]    *See* ROA.10446-10457.  Providence's Anti-Fraud/Corruption Policy informed its employees that it was a violation to "act[] in an official capacity, contrary to their sponsoring company/organization, for personal gain or for some form of improper gain/advantage for someone else.  ROA.9485.  Providence's Information Security Awareness Policy also informed its employees (and Truly) "not [to] disclose sensitive information to third parties [which would include employee salary information], unless they are duly authorized in writing with formal agreements that compel them to protect the information adequately."  ROA.9555.

ROA.10367-10368; ROA.10430.  Indeed, the former employees almost uniformly testified they had never even heard of Truly before receiving their offers. ROA.10269-10270;    ROA.10279-10280;    ROA.10293-10294;    ROA.10306; ROA.10318-10319;    ROA.10328;    ROA.10330-10331;    ROA.10352-10353; ROA.10406-10409; ROA.10426.   The former employees testified that they were following the Flemings and Sheets, which is exactly what Appellees intended to happen.  ROA.10272; ROA.10283; ROA.10296-10297; ROA.10308; ROA.10320-10321; ROA.10329; ROA.10354; ROA.10389; ROA.10396-10397; ROA.10405-10407; ROA.10428.  *See, e.g.* ROA.10437 ("Q:  Is it fair to say that if – if Mark and Tracie hadn't made the move to Truly that you, yourself, wouldn't have made the move to Truly?  … A:  That's fair to say, yes.").

## C.    APPELLEES CAUSED EXTENSIVE DAMAGE TO PROVIDENCE.

Appellees' raid of Providence's offices and employees was successful. During the first week or two of February 2021, Truly hired away more than 20 Providence employees and three highly profitable offices.    ROA.9408-9409; ROA.9463.  By quietly working with Appellees prior to the raid, the Flemings and Sheets left Providence vulnerable to the lightning-fast raid.  Providence soon found itself with empty offices, which were previously filled with profitable, revenue-generating employees.  ROA.9411; ROA.19092-19093.  Appellees and the former Providence employees targeted and usurped business from Providence's now-

former customers. ROA.9411. Upon joining Truly, the former Providence employees promptly began moving customers from Providence to Truly. *See, e.g.,* ROA.10126-10127; ROA.10227-10230; ROA.10298-10302; ROA.10309-10310; ROA.10337-10344; ROA.10355-10358; ROA.10398-10401; ROA.10415-10420; ROA.10431-10436; *see also* ROA.19087 (picture listing some specific loan transactions Sheets moved).

At the time of Truly's raid, Providence was in talks to sell its business to a third party. That potential purchaser dropped its offer price by several million dollars as a result of Truly's actions. ROA.19095; ROA.19164-19168.

In this lawsuit, Providence also retained the services of Todd Lester with FTI Consulting to conduct an economic and financial analysis of the damages Appellees caused to Providence due to its loss of offices and key employees to Truly. *See* ROA.18027; ROA.18030-18034. By analyzing the actual revenues for Providence and Truly, Lester was able to determine that Truly rapidly usurped substantial Providence customers and revenues. ROA.18031-18032. Similar to the potential third party purchaser, Lester determined that Providence suffered a multi-million-dollar loss due to Truly's raid. ROA.18033-18034. Providence's damages testimony was uncontradicted at the summary judgment stage.

19

**D.   PROCEDURAL BACKGROUND**

Providence sued Appellees in February 2021.  ROA.63.  Providence also sued former Providence employees, Tracie, Mark, and Sheets, but all claims between Providence and those employees have been settled.  *See* ROA.11850.  This procedural history focuses on events relevant to Providence's claims against Appellees, Truly and Hanks.  At the time of judgment, Providence's live pleading was its Second Amended Complaint.  ROA.10861.

Providence sued Truly for breach of the NDA and non-solicitation agreement, and both Appellees for federal and state law trade secrets violations, for knowing participation in breaches of fiduciary duty, for civil conspiracy, and for tortious interference with existing contracts, prospective contracts, and customer relationships.  ROA.10874-10878, 10880-10890.

Appellees filed summary judgment motions addressing (1) Providence's federal and state trade secret claims, ROA.8746, and (2) Providence's contract and tort claims, ROA.8826.  They also filed a consolidated summary judgment appendix.  ROA.8854-9064.

Providence opposed Appellees' motions.  ROA.9317 (contract and tort claims) & ROA.9354 (trade secrets).  Providence also filed a consolidated appendix.  ROA.9396-10526.  Providence's sealed trade secret response is at ROA.17920.  Providence's sealed appendix is at ROA.17994-19107.

20

Appellees filed replies.  ROA.10544; ROA.10559; ROA.19108.  Providence filed sur-replies, ROA.10601; ROA.10619; ROA.19145, and supplemental evidence, ROA.10633-10709; ROA.19159-19237.

The district court first granted summary judgment on Providence's federal trade secrets claims.  ROA.11117-11145.  The Court next exercised supplemental jurisdiction over Providence's remaining state law claims, ROA.11272-11274, 11305-11307, and thereafter entered summary judgment on most of Providence's remaining claims against Appellees.  ROA.11372-11405.  After all remaining claims were resolved, the district court entered final judgment.  ROA.19384.  Providence timely appealed.  ROA.11864, ROA.19389.

## SUMMARY OF THE ARGUMENT

The district court erred when it granted summary judgment on Providence's claim for breach of the NDA provisions prohibiting Truly from using Providence's Confidential Information for two years from receipt of such information, for any purpose other than the proposed merger between Providence and Truly.  The evidence establishes that (a) prior to the due diligence under the NDA, Truly knew little to nothing about Providence's Johnson County and Southlake operations, (b) Truly had possession of substantial Confidential Information regarding Providence's offices, employees, and their profitability from the due diligence, (c) Truly determined that Providence's Johnson County and Southlake offices were

21

highly profitable and worth acquiring, but (d) its consultant recommended deferring the acquisition.  After months of negotiation, Truly fabricated a reason for ending merger discussions in 2019 when it objected to an industry-standard legal services agreement, even though Truly previously agreed on that term.  Thereafter, in 2020, Truly pursued Providence's President, Tracie, and then used her to recruit other Providence Team Leaders and employees to move to Truly.  Truly's plan was not only consistent with its consultant's prior recommendation, but it worked.  Truly hired away more than 20 Providence employees and several entire offices, without having to pay Providence for the acquisition cost from the proposed merger.  Truly's breaches caused extensive damage to Providence as Truly acquired the very profitable offices and employees Truly learned about during due diligence in 2019. The only contrary evidence is the self-serving denials of wrongdoing by Truly's representatives, but such denials are insufficient to defeat summary judgment.

Truly also breached the non-solicitation agreement. The district court erroneously concluded that the non-solicitation agreement ended in May 2020 based on a legal error when it failed to read the agreement as a whole.  Read as a whole, Providence offered to provide Truly, a competitor, with office-specific and employee-specific information only if Truly agreed to a one-year non-solicitation, which would begin if they failed to close their merger.  The district court's summary judgment ignored the terms of Providence's offer, which Truly accepted.

22

Appellees also knowingly participated in breaches of fiduciary duties owed to Providence when they used Tracie to steer entire offices to Truly. There is extensive evidence that Appellees participated in Tracie's breaches. The district court further erred when it concluded Appellees could not have participated in Mark's and Sheets' breaches of fiduciary duties because it erroneously concluded there was no evidence of breaches by Mark or Sheets. In short, Appellees were actively involved in each step of the process as Tracie, Mark, and Sheets helped Truly hire Providence employees and set up offices to take away Providence's business opportunities.

The district court's summary judgment rulings on tortious interference and civil conspiracy must also be reversed because they are based exclusively on the district court's erroneous conclusion that Appellees could not be held liable for knowingly participating in breaches of fiduciary duty.

## ARGUMENT

### A.    STANDARD OF REVIEW

This Court reviews the district court's summary judgment *de novo*, using the same standards as the district court, accepting all facts and inferences from the facts in the light most favorable to the non-moving party. *Thomas v. Great Atl. & Pac. Tea Co., Inc.*, 233 F.3d 326, 329 (5th Cir. 2000). Summary judgment is not appropriate "when questions about the credibility of key witnesses loom … large." *Id.* at 331 The Court "must disregard all evidence favorable to the moving party that

the jury is not required to believe." *Id.* at 329. The Court may credit only "that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

Truly's self-serving denials of wrongdoing did not entitle Truly to summary judgment in this case involving concerted actions and conspiracy. *Wackman v. Rubsamen*, 602 F.3d 391, 409 (5th Cir. 2010); *see also Christensen v. Sherwood Ins. Servs.*, 758 S.W.2d 801, 804 (Tex. App.—Texarkana 1988, writ denied) (holding "[s]tatements by alleged members of a conspiracy are not sufficient to conclusively establish the nonexistence of an agreement"); *In re Buescher*, 783 F.3d 302, 308 (5th Cir. 2015) (uncorroborated self-serving testimony could not overcome contrary documentary evidence); *Leader's Inst., LLC v. Jackson*, 2017 WL 5629514, *2, 5 (N.D. Tex. Nov. 22, 2017) (refusing to grant summary judgment to defendant who denied copying, downloading, or using another's trade secrets).

Although substantial direct evidence supports Providence's claims, circumstantial evidence is sufficient to defeat summary judgment. "[D]irect evidence, however suspect it may be," does not trump "circumstantial evidence for purposes of summary judgment." *Thomas*, 233 F.3d at 329. For example, notwithstanding a defendant's direct evidence in the form of his own sworn denials that he did not copy, download, or use plaintiff's trade secrets, "a non-movant can

24

survive summary judgment by presenting circumstantial evidence that the movant used the non-movant's trade secret." *Jackson*, 2017 WL 5629514, at *5 n.14.

**B.    THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO TRULY ON PROVIDENCE'S CLAIM FOR BREACH OF THE NDA.**

The district court erred when it found there was "no evidence" that Truly breached the NDA.  ROA.11390-11391; *see also* ROA.11130-11141.  The district court did not dispute Providence's interpretation of the NDA, nor did it deny that Truly was prohibited from using Providence's Confidential Information for any purpose other than the proposed merger discussions between the parties for a period of two years after *receipt* of such information.  ROA.9446 at ¶¶1, 3, & 9.  Truly continued receiving Providence's Confidential Information from the merger discussions through late 2019, which means that Truly could not use any of that information until late 2021.

*1.    There was significant summary judgment evidence establishing Truly's breach of the NDA.*

The district court did not deny (or even address) the fact that, under its plain language, the NDA's prohibition on usage applied to any Providence Confidential Information acquired from Providence between April 25, 2019 and April 25, 2021. ROA.9447 at ¶9.  Thus, when Truly obtained Providence's financial and employee information from the Flemings and Sheets prior to their departure from Providence, that information was covered by the NDA.  Moreover, after the Flemings, Sheets,

and the many other former-Providence employees joined Truly in February 2021, Truly could not obtain and use for its own benefit Providence's Confidential Information from the former employees, such as Providence's customer names. By transferring entire offices, more than 20 employees, and all of their customers to Truly while the NDA was in effect, Truly clearly violated the NDA. At a minimum, the facts were not conclusively established to the contrary.

But even if the Court focuses solely on the information Providence intentionally provided to Truly as part of the merger discussions, there was ample evidence to defeat Truly's summary judgment on the breach of the NDA claim. *See* ROA.9446 at ¶1 (NDA applying to Providence's information regardless whether it was provided "intentionally or unintentionally" to Truly).

When analyzing the evidence Providence provided to Truly under the NDA, the district court erred when it failed to begin at the beginning.[8] Early on in due diligence on June 20, 2019, Truly's Texas President, Hanks, admitted to his out-of-state colleagues, that there were many Providence offices about which he knew very little. ROA.18458. Hanks identified Providence's Johnson County (Burleson,

---

[8]    The district court's analysis jumped too quickly to "after the breakdown in the parties' negotiations." *See* ROA.11118. Moreover, when analyzing Providence's trade secret claim based on Providence's office-level financial information, the district court did not address the fact that Truly had no prior knowledge of those offices and only learned such information during due diligence when it obtained information under "the strict requirements of the NDA." ROA.11138-11141.

Burleson-Old Town, and Cleburne) and Southlake offices as falling into the "don't know well" category.  ROA.9794-9796; ROA.18460-18461.  Those are the very offices Truly acquired in February 2021, based on discussions it began in 2020.  This leads to the logical question of what changed such that Truly was able to go from not knowing much about these offices to hiring away all of them.  The logical answer is the information obtained during due diligence.

During due diligence, Providence provided Truly with extensive office performance and financial information regarding those offices.  *See* ROA.11138 ("the evidence shows [] that Truly received such confidential information under the strict requirements of the NDA").  It also provided information on the specific employees in those offices.  *See* ROA.9800-9810; ROA.9838-9845; ROA.18456; ROA.18463; ROA.18528-18547; ROA.18598-18604.  From that information, Truly had ample opportunities to assess Providence's offices and employees—and its consultant (Cranton) actually assessed that information during due diligence.

Perhaps because it was focused on the trade secret claims, the district court noted that Cranton "acquired [Providence's] information lawfully under the terms of the NDA."  ROA.11139 at n.8; *see also* ROA.11391 at n.10 (repeating that conclusion).  But Providence never disputed that Cranton's acquisition of Providence's information was lawful.  Instead, Providence's claim for breach focuses on whether Truly exceeded its rights "under the terms of the NDA" after

27

assessing Providence's offices and employees with Cranton's help.  Notably, the purpose of an NDA is to prevent a party from obtaining a competitor's information, only to turn around and use it against the competitor—instead of using if for the purposes for which it was provided.  But for obtaining Providence's information during due diligence, Truly would not have had sufficient information regarding the Johnson County and Southlake offices that it acquired in February 2021.  Indeed, Truly admitted it had no plans to open offices in those locations, but for the Providence offices and employees.  ROA.10073-10076; ROA.19055-19062.  Truly did not obtain information regarding those locations from independent sources unrelated to Providence.

After assessing Providence's offices in 2019, Cranton advised Truly that "I do see a path to $2m in profitability, but probably not by the end of 2020….a later closing date is advisable." ROA.9745; ROA.18197-18198.  He also explained "2019 looks like a losing year" and that November through February are "traditionally bad." ROA.9745; ROA.18198.  The negotiations between Providence and Truly ended in late November or December 2019.  ROA.9406.  Based on this evidence, a reasonable juror could conclude that Truly followed its consultant's advice and delayed its Texas expansion plan.

There is additional evidence that further gives rise to a reasonable inference (and indeed, compelling inference) that Truly used Providence Confidential

Information when it decided to pursue Providence's Johnson County and Southlake offices in 2020 and early 2021. That evidence includes:

- by cherry-picking only profitable offices from Providence, Truly avoided the expenses, burdens, and hassles it would have faced from its original plan, which involved layoffs, closing offices, and right-sizing; ROA.9728;

- Truly succeeded in hiring Providence's employees by only slightly increasing those employees' salaries, ROA.9588-9589; ROA.18051-18060 (comparison of employment terms);[9] and

- the issue that caused the impasse in the negotiations was a manufactured excuse as Truly sought to change an industry standard term that was agreed to by the parties since the beginning of the discussions; ROA.10478-10479.

Weighed against the evidence cited herein, Truly's self-serving denials that it used Providence's information was insufficient to entitle Truly to summary judgment. Indeed, it is not credible to argue, as Truly does, that it forgot what it learned during

---

[9]  In its trade secrets ruling, the district court wrote there was no evidence that the defendants used Providence's compensation-related information. ROA.11137-11138. The district court recognized "the evidence shows [] that Truly obtained Providence's compensation information from Tracie Fleming and Kim Sheets-Sheffield." ROA.11137. The district court further quoted Tracie's key admission that "she provided Hanks with '[w]hat [she] believed would be … good offers for the people who reached out and wanted an offer.'" ROA.1138. But the district court ignored the extensive evidence that these employees were not looking for offers, they did not "reach out" to Truly, but instead, they acted because of the Flemings prompting them to act, and Truly then made them offers that were surprisingly consistent with the information provided by Tracie and Sheets. *See* pages 17-18 above. Truly's self-serving denials do not control over the contrary evidence.

due diligence, but then conveniently (a) hired away only profitable offices that Truly did not know about prior to the due diligence, (b) acquired those offices and employees at a time when Truly's consultant said profitability would be better, and (c) acquired them at salaries consistent with and only slightly above what they were paid at Providence.

> 2.     *The district court's summary judgment analysis conflated the breach of NDA claim with Providence's claims for misappropriation of trade secrets.*

The district court's analysis of Providence's breach of NDA claim consists of one-half page at ROA.11391.  There, the district court incorporated its prior ruling regarding the "use" element for a trade secret claim.  ROA.11391 ("there is no evidence that Truly ever used Providence's information in an improper manner, as the Court explained in detail in its order granting Defendants' motion for summary judgment on Providence's Defend Trade Secrets Act claim.").  The district court's trade secret analysis focused on only three topics:  (1) customer lists (*i.e.*, the "business source" and "at-risk" reports), (2), employee compensation information, and (3) branch-specific financial information.  ROA.11133-11141.  The NDA is much broader.  It prohibited Truly from using any of Providence's Confidential Information, regardless whether it was a trade secret.  ROA.9446 at ¶¶1. 3.  By collapsing the NDA analysis with its trade secret analysis, the district court ignored significant evidence supporting Providence's breach of the NDA claim, including

the undisputed evidence that Truly went from knowing nothing about the Providence Johnson County and Southlake office to hiring them all following the due diligence process.

The district court cited no authority (other than its own prior trade secret ruling) to support its analysis regarding why Providence's evidence was insufficient to create a fact issue on whether Truly breached its contract with Providence. *See* ROA.11390-11391. The primary authorities the district court cited in its trade secrets analysis—*GE Betts, Inc. v. Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018), and *CAE Integrated, L.L.C. v. Moov Technologies, Incorporated*, 44 F.4th 257 (5th Cir. 2022)—do not support summary judgment on the breach of NDA claim.[10]

The district court wrote that this case is "strikingly similar" to *GE Betts, Inc.*, ROA.11134, but it is not. *GE Betts* involved claims against a single former employee who allegedly solicited his former employer's customers. 885 F.3d at 322. The Court focused extensively on the former employee's contacts with the former employer's customers, recognizing that "there is no evidence of the content of those conversations," there is "no evidence tying referrals … to any sale by AmSpec [the new employer]," and "the fact that AmSpec was quickly able to compete with GE is not evidence that Moffitt-Johnston solicited clients she was not permitted to solicit,

---

[10]    The district court also cited *Southwestern Energy Production Company v. Berry–Helfand*, 491 S.W.3d 699 (Tex. 2016). That case focused on damages and the statute of limitations, neither of which are issues here.

especially in light of the fact that AmSpec had previously done inspection work for those same clients and therefore had existing relationships." *Id.* at 323-24. Here, in sharp contrast, Providence's breach of NDA claim does not involve just a single employee; it involves entire offices and more than 20 employees that abruptly left Providence for Truly.

Unlike the defendant in *GE Betts*, there is no evidence that Truly had prior relationships with any of the Providence customers who switched following the mass departure in February 2021. The evidence established that Truly had no knowledge about the offices it subsequently acquired prior to accessing Providence's information during due diligence. It had no plans to open offices in Johnson County or Southlake without the Providence employees and their contacts. Thus, Truly was not pursuing those markets or customers in those markets prior to February 2021. And, although there was significant evidence of Tracie's "suspicious behavior" and "Truly's subsequent success" recruiting Providence's former customers, Providence's breach of NDA claim is not focused solely on the solicitation of its customers. *See* ROA.11133; ROA.11136.

The other case the district court cited, *CAE Integrated, L.L.C.*, is also different from this case. *CAE* involved a single employee who allegedly pursued his former employer's customers. The former employee did not even join his new employer until "after waiting out his noncompete[.]" 44 F.4th at 260. Following a disputed

evidentiary hearing, the district court found that the former employee did not have access to CAE's customer-related information and customer lists that were the alleged trade secrets. *Id.* at 262. "Of the 200 contacts" at issue, "the majority were listed [in the corporate defendant's] database before [CAE's former employee] joined that [new employer]." *Id.* at 263.

This Court also upheld the district court's finding that there was no evidence to show that the defendants used CAE's customer-related trade secrets. *Id.* at 263-64. Use of trade secrets could not be inferred based on access alone. *Id.* And given that the former employee did not have access to CAE's trade secrets, "CAE cannot show a likelihood of success on its trade secrets claim as it cannot show that [the former employee or his new employer] are in a position to use its trade secrets." *Id.* at 264.

This case is different from *CAE* because (1) Truly did not wait until its contractual non-use provisions ended before taking action, (2) Providence did not sue Truly based solely on the results of Truly's operations in Johnson County and Southlake, and (3) this case is about far more than a single employee pursuing former customers. Providence sued based on all of the evidence, which started from Truly's lack of knowledge of those offices, continued through the due diligence and analysis of Providence's offices, and then, after receiving its consultant's recommendation to delay, Truly ended the merger negotiations in 2019, choosing instead to cherry-pick

key offices and employees in late 2020 and early 2021, while Truly was still bound by the NDA's non-use provisions.

In short, the trade secret cases the district court relied upon do not support summary judgment on Providence's breach of NDA claims. And, the district court did not analyze the evidence in the context of the breach of NDA claim, choosing instead to just adopt its trade secrets analysis. The district court's summary judgment decision on the breach of the NDA claim cannot stand.

## C.    THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO TRULY ON PROVIDENCE'S CLAIM FOR BREACH OF THE NON-SOLICITATION AGREEMENT.

The district court also erred when it failed to apply settled principles of Texas contract law—interpreting the non-solicitation agreement as being in effect only until May 9, 2020. ROA.11388. The district court was required to interpret the agreement as a matter of law to give effect to the parties' intentions, as expressed in the language used in their agreement. *See Finley Resources, Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339 (Tex. 2023). The district court should have reviewed the contract as a whole "in an effort to harmonize and give effect to all provisions of the contract so that none is rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). The meaning of the agreement must be determined in the context it was used. *Finley*,

34

672 S.W.3d at 340. It should not be read to defeat the parties' intent. *Barrow-Shaver*

*Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

The fundamental errors committed by the district court appear in footnote 9

of its summary judgment opinion where the court limited the time period of the

agreement. ROA.11388. The district court wrote:

> Providence appears to presume that the non-solicitation agreement
> "expired in November or December 2020"—one year after the
> negotiations ceased, rather than one year after Truly entered the
> agreement. … Providence does not provide any legal authority
> establishing that the enforcement date of the non-solicitation agreement
> extended one year from the end of the parties' negotiations instead of
> one year from the contract execution.

ROA.11388. The district court's conclusion flowed from its legally erroneous

holding that: "In its entirety, the agreement states 'this email confirms that Truly

Title, Inc. herby agrees to a one year non-solicitation of Providence Title

employees'." ROA.11388. Rather than quoting the entire agreement, the district

court focused only on the language of Truly's acceptance of the non-solicitation

agreement. Of course, a legally enforceable contract consists of both an offer and

acceptance in strict compliance with the terms of the offer. *Parker Drilling Co. v.*

*Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet

denied); *see also Angel, Trustee for Gobsmack Gift Trust v. Tauch*, 642 S.W.3d 481,

483 (Tex. 2022) ("Offer and acceptance are essential elements of a valid and binding

contract.").

Here, the non-solicitation agreement begins with Providence's offer:

> happy to provide all information requested but some items provide
> more info than I would want to give a competitor <u>in the event we don't
> get a deal done</u>.  As I said, to drill down deeper to offices / employees
> I would want a one-year non-solicitation <u>to let info get stale</u>.  I believe
> two years is the norm, but would be satisfied with one.

<u>ROA.9442</u> (emphasis added).  Truly responded with its acceptance that:  "this email

confirms that Truly Title, Inc. hereby agrees to a one year non-solicitation of

Providence Title employees."  <u>ROA.9442</u>.  Taken together, this offer and acceptance

created the non-solicitation agreement.  It was error to focus on the language of the

acceptance alone.

Providence's CEO testified to his understanding and intent when making the

offer, which was a condition for Providence providing detailed office and employee

information to Truly:  "[w]hen I entered into this agreement with [Truly], it is my

understanding that the one-year non-solicitation period began if and when the parties

were unable to reach an agreement on a deal."  <u>ROA.9406</u>.  Foster's testimony is the

natural conclusion to be drawn from his proposal seeking a non-solicitation

agreement "to let info get stale" "in the event we don't get a deal done."  <u>ROA.9442</u>.

Following this agreement, Providence provided detailed office and employee

information to Truly all the way through the termination of the negotiations, which

lasted approximately six months.  Thereafter, the non-solicitation agreement was

intended to give Providence the protection of a one-year period to allow the information to become stale.

Truly's interpretation of the non-solicitation agreement, which the district court adopted, cuts the non-solicitation period by half—to just six months. ROA.11388. That interpretation eviscerates the language, purpose, and intent of a non-solicitation agreement. Moreover, an interpretation, under which the one-year period began to run immediately after the parties exchanged e-mails confirming the agreement, leads to the following absurd results: (1) the LOI expressly contemplated that negotiations would include Truly's identification and solicitation of "key" Providence employees (including the execution of individual non-compete agreements with those Providence employees), which would be impossible if the non-solicitation agreement kicked in during those same negotiations; (2) after entering the non-solicitation agreement, and during negotiations, Truly continued to request and Providence continued to provide updated Confidential Information that necessarily would have less than one year of protection if the non-solicitation clock were already ticking; and (3) if the parties' negotiations lasted a year or more from the date of the non-solicitation agreement, Truly could immediately then use that information to hire Providence's employees and take over its offices without waiting

any length of time, which is plainly not what the parties contemplated.[11] Courts should avoid construing a contract in a way that is "unreasonable, inequitable, and oppressive," *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987), and must "avoid constructions of contract language that would lead to absurd results." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022). "If a contract is susceptible to more than one construction and one of those makes the contract fair, customary, and such as prudent people would naturally execute, while the other would make it inequitable, unusual, or such as reasonable people likely would not execute, we will adopt the rational and probable interpretation." *Ill. Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 533 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Truly offered no testimony rebutting Foster's plain language understanding of the agreement. *See* ROA.8829 (citing only "Exhibit 17"—the May 9, 2019 email agreement); 8841-8842 (same); *see also* ROA.8855 (identifying Exhibit 17); ROA.8963-8964 (Exhibit 17). But even if Truly offered contrary evidence, that would just create a fact issue on the parties' intent based on the language used in the

---

[11] In the district court, Truly argued Providence "could perpetually extend the one sentence Non-Solicitation Agreement by simply informing Truly that it remains interested in the contemplated business transaction." ROA.8842. Truly's argument is based on a false premise—that one party could extend negotiations indefinitely. Truly, however, could have unilaterally terminated negotiations at any time, at which point it would stop requesting and receiving Providence's Confidential Information. As soon as Truly elected to terminate negotiations, the clock on non-solicitation would start and the information Truly had received would, after a year, become stale.

agreement, which would present an issue for the jury to resolve.  *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229-32 (Tex. 2003)*; Coker v. Coker*, 650 S.W.2d 391, 394-95 (Tex. 1983).  Providence, however, believes there is no fact issue and, as a matter of law, the district court adopted the wrong interpretation of the non-solicitation agreement.  Applying the correct interpretation of the non-solicitation agreement, Truly breached that agreement when it actively solicited the Flemings and Sheets during the non-solicitation period.

**D.    THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO APPELLEES ON PROVIDENCE'S CLAIM FOR KNOWINGLY PARTICIPATING IN BREACHES OF FIDUCIARY DUTIES.**

Under Texas law, "[w]hen a third party knowingly participates in the breach of fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.) (quoting *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.)); *see also Stein v. Meachum*, 748 S.W.2d 516, 518–19 (Tex. App.—Dallas 1988, no writ) ("Anyone who commands, directs, advises, encourages, procures, controls, aids, or abets a wrongful act by another, is regarded by the law as being just as responsible for the wrongful act as the one who actually committed it.").  To establish a claim for knowing participation in breaches of fiduciary duty, the plaintiff must prove "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship, and (3) that the third party

was aware that it was participating in the breach of the fiduciary relationship." ROA.11377 (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)).   "To inform whether a defendant knowingly participated, courts consider whether a defendant 'contributed to, induced, or facilitated the other party's breach of its fiduciary duty.'"   *Caliber Home Loans, Inc. v. Cove*, 2025 WL 71983, *14 (N.D. Tex. Jan. 10, 2025) (citing *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 573 (N.D. Tex. 2024)).   The district court erred when it granted summary judgment to Appellees on Providence's claims for knowingly participating in the breaches of fiduciary duty by Tracie, Mark, and Sheets.

### 1. Truly and Hanks knowingly participated in Tracie's breaches of her fiduciary duties.

Neither Appellees nor Tracie dispute that Tracie owed fiduciary duties to Providence as its president.   ROA.11319.   The district court also found that Providence "has a viable breach-of-fiduciary-duty claim against Tracie."[12]

---

[12]   Providence explained Tracie's breaches of fiduciary duties at ROA.7137-7145, which included, but were not limited to, recruiting employees for a competitor, failing to act in Providence's best interest when she did not seek raises for those she hoped to hire for that competitor, sharing financial information to confirm the Providence Johnson County offices were profitable, and remaining silent instead of telling Providence when Truly was actively pursuing Providence executives and team leaders for months in 2020 and planning to open competing offices that corresponded with each of Providence's locations in Johnson County and Soutlake.   Such conduct, including by remaining silent, is actionable in a breach of fiduciary duty claim.   *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 285 (5th Cir. 2007) ("an agent has a duty not to mislead the principal about the agent's intentions" and "[a]n agent's silence may mislead the principal.") (quoting RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. c (2006)).

ROA.11319-11323; ROA.11380.   And, "the Truly Defendants [*i.e.,* Appellees] knew [Tracie] to be a Providence officer."   ROA.11380; *see also* ROA.18932 (Hanks congratulating Tracie on becoming president).   Thus, Appellees knew she owed fiduciary duties to Providence.   *See International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576-77 (Tex. 1963).   Appellees also knew Tracie:

> provided Graham Hanks with Providence's financial performance data, negotiated some of the terms of Mark Fleming's contract, visited potential office locations for Truly's expansion and sent Hanks her thoughts, and purportedly recruited other Providence employees after she resigned from Providence.

ROA.11380.   The district court found, however, that this conduct focused on Tracie's misdeeds, and not those of Appellees.   *See* ROA.11380.

The district court overlooked significant evidence of Appellees' actions. Hanks was a driving force behind Truly's Texas expansion by hiring Providence employees and taking over entire offices.   ROA.9404-9405; ROA.9478.   When Hanks (on behalf of Truly) renewed his discussions with Tracie in mid-2020, ROA.18932-18933, Tracie began using a secret cell phone for her communications with Hanks because "it was not … purely innocent anymore."   ROA.9889-9890. Hanks knew too because he was communicating with Tracie on a new phone number, which he labeled "Tracie Fleming 2" on his phone.   ROA.18977.   They only switched back to using her main number when Tracie left Providence. ROA.9890 (Tracie:  "I was working at Truly then.  It was no longer an issue.").   The

text communications between Hanks and Tracie on her regular phone jump in time from August 27, 2020 to February 3, 2021, which was immediately after Tracie joined Truly. ROA.18933. Their intervening text messages on "Tracie Fleming 2" are very enlightening to show Truly's and Hanks' active participation in Tracie's breach of duties owed to Providence. *See* ROA.18977-19055. The logical reason Tracie switched to using the secret phone—she did not want to risk someone at Providence seeing what she and Appellees were doing.

Hanks' text to "Tracie Fleming 2" began with the admission that Truly's President and Chief Operating Officer, Mike Kirby, had tried to reach out to another Providence executive, "Steve" to "start some dialogue." ROA.18997. Tracie encouraged Hanks to try again in November, believing the timing would be better. ROA.19009. Steve apparently wasn't interested. Hanks and Tracie also discussed Truly's efforts to approach another Providence executive, "Bree," but "she never said she would meet to move companies." ROA.18999. These communications show that Truly was not just trying to hire Tracie or even her entire Johnson County group; they wanted more.

As explained above, Truly successfully pursued Sheets and the entire Providence Southlake office. Hanks told Tracie about those efforts, but even though Tracie was Providence's President, she allegedly "didn't want to know anything." ROA.9882-9883. By keeping quiet and not disclosing this to other Providence

leaders, Tracie breached her duties to Providence.  *See Holloway*, 368 S.W.2d at 577 (an officer's duties include "an extreme measure of candor, unselfishness, and good faith" to their employers).  Appellees necessarily knew she was not informing Providence of the truth because they were in active discussions with Tracie for her and others to join Truly.

Early on in their text communications on Tracie's secret phone, Hanks asked Tracie how the month ended on August 30, 2020.  ROA.18997.  Hanks' question prompted Tracie to respond with Providence's Johnson County confidential performance numbers for the last two months, as well as the "year over year" comparison.  ROA.18997.

On September 10, 2020, Tracie told Hanks: "I'd love to sit down with you on Monday or Tuesday and talk about our thoughts on this …" ROA.18998.  Kirby was in town too.  ROA.18998.  Tracie agreed to meet with both Hanks and Kirby, but asked "Where can we meet that we won't run into people?"  ROA.18998.  She wanted privacy because she did not want to risk others asking about what Tracie and Truly's officers were doing.[13]

Following that meeting, Hanks wrote:  "GREAT meeting today!  I know we can get this done ✅" ROA.18999.  Many follow-up discussions occurred by phone.

---

[13]    *See also* ROA.18997-18998 (Tracie writing "I'm getting together all my paperwork … which is hard without being obvious.").

43

ROA.19000.  But on September 24, 2020, Tracie asked to meet again in October "to plan and create a strategy."  ROA.19000.  By mid-October, they were discussing employment-related details.  ROA.19004.  Tracie also shared more information regarding Providence revenues and profits with Hanks.  ROA.19004.

By mid-November 2020, Hanks asked Tracie for Mark's email address so Hanks could send him an offer letter from Truly.  ROA.19006.  Hanks also began asking Tracie for her assistance in locating office space.  ROA.19006.  Tracie, in turn, set up a meeting for Mark to meet with Hanks about Truly.  ROA.19007-19008.

On November 20, Hanks wrote "it will be January before we know it," ROA.19009, which is an indication of when Truly planned to act.  So, Hanks asked Mark to look for office space for Truly, even though Mark was still a Providence Team Leader.  ROA.19009.  Thereafter, Hanks and Tracie shared many communications about potential office locations.  ROA.19010-19011; ROA.19014-19017; ROA.19019; ROA.19021-19025.  They also discussed lease terms for Truly while Tracie was still Providence's President.  ROA.19038-19039.

Through December and into January, Hanks and Fleming continued working on their "game plan."  ROA.19021; ROA.19026.  On January 7, 2021, Hanks asked Tracie "Should we meet once prior to just game plan?  Or are you good?" ROA.19026.  Tracie responded:  "I'd love to meet … I want to go over people and salary needs so when they start calling you – you can have their offers ready."

44

ROA.19026.  They set their in-person meeting for January 18, 2021.  ROA.19027-19029.

While working on their plans, Hanks also communicated with Sheets and requested information regarding the Providence Southlake employees' compensation plans.  ROA.19064.  Hanks asked Sheets about the number of offices she needed for her team.  ROA.19065-19066.  Sheets also shared the specific needs for some team members.  ROA.19070.  These communications all occurred even before Truly met with Sheets' team members.  Ultimately, Hanks and Sheets set up a happy hour / job interview meeting between Truly and Providence's Southlake employees, at which time Hanks discussed job opportunities at Truly for them. ROA.10037-10039;    ROA.10077;    ROA.10119-10125;    ROA.10129-10132; ROA.11352-11353.  Hanks knew Sheets was still working for Providence when they set up this meeting.

By late January 2021, Hanks wrote that there was only a "small chance the people we are hiring backout."  ROA.19052.  He further explained: "if that happened, I'd have no reason to operate in any of these markets."  ROA.19052.  But their efforts were successful. Everyone at the happy hour with Sheets promptly joined Truly in February 2021.  ROA.10045; ROA.18114-18121.  And when the Flemings resigned in early February 2021, Appellees were ready to hire more than 20 employees and entire offices on just a few hours' notice.

45

Thus, Appellees were actively participating in and encouraging Tracie to help Truly compete against Providence even before she resigned as Providence's President. Moreover, when Truly made its formal employment offer to Tracie in 2020, Truly granted her participation in a "bonus pool" that was tied to the profitability of Truly's Texas offices "under [her] supervision." ROA.9891-9892; ROA.1428. That bonus pool incentivized Tracie to recruit Providence employees to Truly because, if she had no one working under her supervision, she would not earn a bonus. ROA.9892 (admitting "Yes, that's correct").

### 2.    *The district court relied on inapposite authority.*

When granting summary judgment on Providence's knowing participation claim, the district court relied almost exclusively on *Crossroads Hospice, Inc. v. FC Compassus, LLC*, 606 S.W.3d 294 (Tex. App.—Houston [1st Dist.] 2020, no pet.), *vacated but not withdrawn*, 2020 WL 3866902 (Tex. App.—Houston [1st Dist.] July 9, 2020), calling that decision "particularly instructive" and "strikingly similar." ROA.11378-11380.[14] No party cited *Crossroads* to the district court. More importantly, it is plainly distinguishable.

---

[14] *Crossroads* settled prior to when a petition for review was due to be filed. *See* June 5, 2020 Notice, Case No. 20-0336, *FC Compassus, LLC v. Crossroads Hospice, Inc.*, in the Texas Supreme Court ("Petitioners hereby notify the Court that settlement has been finalized, and Petitioners will not be filing a petition for review."); *see also* 2020 WL 3866902. But for a settlement, *Crossroads* may have been subject to further review.

In that case, Compassus's employee, Clement, left Compassus to work for a competitor, Crossroads. 606 S.W.3d at 298-99. Clement coordinated the departures of several other Compassus employees. *Id*. Significantly, however, in *Crossroads*, the court limited its analysis to approximately five e-mail exchanges that took place over one month (May 2 to June 5). *Id*. at 298-99. Crossroads was merely a passive recipient of information from Clement. The Court explained:

> All of the actions described above are actions taken by Clement, not Crossroads. The fact that Crossroads received emails and updates from Clement is not evidence that Crossroads participated in the alleged solicitation of Dr. Lee.

*Id*. at 304. The court observed: "Every one of the actions enumerated above was taken by Clement." *Id*. at 305. All of the facts Compassus cited to support its claim reflected unilateral actions by Clement. For example, (1) "Clement hand-picked Compassus employees to approach," (2) "Clement identified" specific employees to be offered jobs, (3) "Clement raised" job opportunities for Compassus employees, (4) "Clement served as a conduit" for communications, (5) "Clement specified" positions, start dates and compensation, etc. *Id*. at 304. The court correctly pointed out that: "Clement's name precedes every verb in the list." *Id*. at 305.

Here, by contrast, communications between Tracie and Truly stretched across six months (August 2020 to February 2021) and included numerous e-mail exchanges, secret text messages, in-person meetings, site visits to potential office locations, and lease negotiations. Appellees were actively pursuing, soliciting,

incentivizing, encouraging, and participating in Tracie's breach of fiduciary duties. This is not a case of a passive bystander to another's breach of duties.

*7X Cattle Co. LLC v. Brandstadt*, 2025 WL 852624, (E.D. Tex. Feb. 28, 2025), *adopted* 2025 WL 848446 (E.D. Tex. March 18, 2025), is more analogous to this case. In *7X Cattle*, the court found a material fact issue sufficient to defeat summary judgment on the plaintiff's claim for knowingly participating in breaches of fiduciary duty. *Id.* at *13-17. The court distinguished *Crossroads* because, in *7X Cattle*, there were "email exchanges … that would allow a trier-of-fact to reasonably infer" that the defendants "were not merely passively receiving information … but actively encouraging him to share information." *Id.* at *14.[15] Here, there were emails, text messages, and even admissions from Tracie and Hanks about their conduct.

The court in *7X Cattle* also found that "a trier-of-fact could infer that Pinehurst knowingly solicited advice" regarding a lease. *Id.* at *15. Here, documentary evidence and testimonial admissions confirmed Truly solicited advice from Tracie, Mark, and Sheets regarding leases for Truly's planned offices to compete against Providence, while those individuals were still employed by Providence.

In *7X Cattle*, the court noted that "there is evidence Brandstadt was compensated for his work for Pinehurst" when breaching his duties to the plaintiff.

---

[15] Apart from *7X Cattle*, no court has cited or relied upon *Crossroads* in any published opinion.

*Id.* at *15.  Similarly here, Truly promised to include Tracie in the Texas bonus pool under which she would be compensated for those who worked under her supervision, which means she was being offered compensation for the people she helped Truly acquire at Providence's expense.

Judge Lynn's decision in *Caliber Home Loans, Inc. v. Cove*, <u>2025 WL 71983</u> (N.D. Tex. Jan. 10, 2025), is also instructive.  In that case, the district court found material issues of fact to preclude summary judgment on a knowing participation claim where, as here, a defendant provided "assistance and encouragement to breach their fiduciary duties by, among other things, soliciting Caliber employees to leave Caliber and join Cardinal." *Id.* at *14.  As in *Caliber*, the evidence here shows Truly and Hanks working alongside Tracie to formulate plans on how to pursue Providence offices and employees while Tracie was still employed by Providence.  *Id.* at *15. *Caliber* shows that where, as here, a defendant works with an insider of a competitor to raid significant employees and business, the defendant should stand trial for its knowing participation in the breaches of fiduciary duty.

      3.    *The district court erred when it found that Providence Team Leaders, Sheets and Mark, did not breach fiduciary duties owed to Providence.*

Appellees are also liable for knowingly participating in Mark's and Sheets' breaches of fiduciary duty to Providence.  The district court did not dispute that Mark and Sheets owed fiduciary duties to Providence as Providence Team Leaders.  *See*

ROA.11324 ("As Team Leader for Johnson County, it is at least arguable that Mark had a fiduciary relationship with Providence."); ROA.11362 ("As Team Leader for Providence's Flower Mound and Southlake offices, it is at least arguable that Sheets-Sheffield had a fiduciary relationship with Providence."). Thus, Mark and Sheets had "a duty not to mislead [Providence] about [their] intentions." *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 285 (5th Cir. 2007). Silence, of course, may be misleading and a breach of fiduciary duties. *Id.*

Even without a formal fiduciary relationship, however, this Court recognizes that there are limits on what an employee may do: "such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer." *Id.* at 284 (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002)) (emphasis added). Quoting the RESTATEMENT (THIRD) OF AGENCY 8.04 cmt. b (2006), this Court continued: "[T]he tactics that an agent may use in competing or preparing to compete are subject to legal limits.... The actions of ... agents may become wrongful when they constitute concerted action designed with the purpose of leaving the principal in the lurch." *Navigant*, 508 F.3d at 284. Similarly, the First Court of Appeals explained:

> The right to prepare to compete notwithstanding, if the nature of a party's preparation to compete is significant, it may give rise to a cause of action for breach of a fiduciary duty. … This is particularly true if

50

> a supervisor-manager acts as a "corporate pied piper" and lures all of his employer's personnel away, thus destroying the business.

*Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 511–12 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (internal quotation omitted).[16]  This case may be the poster child for breach by a group of employees working in concert to help a competitor they are joining, with the intended effect of leaving their former employer in the lurch.

Mark worked closely with Tracie, Truly, and Hanks to lure away all of Providence's Johnson County employees, leaving Providence with empty offices and a substantial loss in customers.  First, the district court acknowledged that Mark had told his daughter, who was another Providence employee on his team, that he was moving with Tracie to Truly.  ROA.11324; *see also* ROA.6533.  Neither the district court nor Appellees have cited any authority creating a "daughter" exception to breaching fiduciary duties.  Then, the district court acknowledged Mark worked

---

[16]  Addressing an analogous situation, the California Supreme Court aptly explained in *Bancroft-Whitney Co. v. Glen*:

> It is beyond question that a corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting of the corporation's employees by a competitor, he supplies the competitor with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment.  This conclusion is inescapable even if the information regarding salaries is not deemed to be confidential.

411 P.2d 921, 938-39 (Cal. 1966) (cited with approval in *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476 (Tex. App.—El Paso 1975, writ ref'd n.r.e.)).

with Truly to acquire office space while he was still employed by Providence. ROA.11326. But there is much more that was not addressed by the district court.

Mark knew his wife's compensation at Truly depended on the recruitment of Providence employees; otherwise, they would have no revenues to share in for the "bonus pool." Mark also helped Tracie set the stage for success prior to Appellees' corporate raid in Johnson County. ROA.7758-7763. As a team leader, Mark was responsible for making salary recommendations for his team. Providence contacted Mark in late January 2021, telling him "we need your input." ROA.10006. "If you think someone is due for a raise, please let us know 1) who you are thinking of 2) what increase you believe is appropriate 3) what they have done to earn a raise." ROA.10006. Mark responded to Providence's CFO: "Hey buddy … Tracie and I spoke about this the other day and she has all my wishes if that is okay? I am sure she will send them in to you guys." ROA.10011. Mark could not remember making any recommendations for raises for his team. ROA.7762-7763. And, Tracie made no recommendations for raises from Providence for the employees she and Mark were planning to take with them to Truly. ROA.9410-9411; ROA.9562-9563; ROA.9935-9936. Giving those employees raises would have made it more difficult for Truly to hire them.

Mark was the "corporate pied piper" who knew his team would follow when Tracie and Mark moved to Truly. *See Abetter Trucking Co.*, 113 S.W.3d at 511–12.

The district court wrote that the Johnson County employees "reached out to [Mark]." ROA.11324. However, Mark initiated the communications with the Johnson County employees, meeting with some in the parking lot, and calling two other offices. ROA.9976-9983. Then, he received return calls from the employees, many of whom were on the phone for only a matter of minutes before they decided to leave Providence for a company they had never heard of before talking to Mark. ROA.18912. The logical inferences here are that (a) the parties already talked or (b) the Johnson County employees were vulnerable to job offers after being passed over for an annual raise.

Sheets also breached her fiduciary duties to Providence. For starters, as the district court acknowledged, and while still employed by Providence, Sheets "gave Truly information that could be helpful to recruit" her team. ROA.11362. Sheets admitted she gave Truly compensation information about her team while she was still employed by Providence knowing that it would be helpful information for Truly to recruit Sheets' entire team. ROA.10113-10114. When asked about raises for her Providence team, Sheets recommended only minimum cost of living increases. ROA.10006; ROA.10106. Sheets had already told Truly she was trying to bring her entire team with her to Truly. ROA.10109-10111; ROA.10117. And when asked by Providence about whether her team members should receive raises in early 2021, Sheets did not recall asking Providence to give them raises. ROA.1006;

53

ROA.10106.  Had Sheets pushed for meaningful raises for her team at Providence, it would have made it more difficult for Truly to hire them away.

While still employed at Providence, Sheets set up a happy hour job interview for her team to meet with Truly's Hanks and Byrns.  ROA.10037-10039; ROA.10077; ROA.10119-10125; ROA.10129-10132.  She did not even tell her team she was setting this up with a competing company to try to get them to move. ROA.10121.  Nevertheless, the happy hour surprise of being recruited to a competitor was the team's only meeting with Truly prior to when they joined the company.  ROA.10077.  And the entire team made the move to Truly.  ROA.10045; ROA.18114-18121.  In short, Sheets breached her fiduciary duties when she helped Truly recruit her team while denying raises to make them more receptive to alternative employment.

### E.   THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT ON PROVIDENCE'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.

The district court also erred when it granted summary judgment on Providence's claim for tortious interference with prospective business relations with its existing customers and with an interested purchaser.  ROA.11391-11393.  The district court explains that the elements for a tortious interference with a prospective customer relationship claim are:  (1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either

54

acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) proximate cause; and (5) actual damage or loss as a result.  ROA.11391-11392 (citing *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)). The district court assumed that all elements were met, except for element (3)— "Providence has not presented evidence that the Truly Defendants engaged in independently tortious conduct."  ROA.11392 (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)).

> The entirety of the district court's reasoning is:
>
> As explained herein, Providence has failed to present sufficient evidence to survive summary judgment on any of its tort claims against the Truly Defendants.  Thus, the Truly Defendants are entitled to summary judgment on these claims because they did not engage in any "actionable [conduct] under a recognized tort" such that their conduct was "independently tortious or wrongful."

ROA.11392-11393.  Because the district court's summary judgment on the knowing participation claim should be reversed (as explained above), the summary judgment on tortious interference must also be reversed.  The knowing participation claim supplies the independently tortious conduct needed to support this claim.

**F.    THE DISTRICT COURT FURTHER ERRED WHEN IT GRANTED SUMMARY JUDGMENT ON PROVIDENCE'S CONSPIRACY CLAIM.**

The district court also erred when it granted summary judgment on Providence's civil conspiracy claim.  ROA.11393-11394.  Civil conspiracy is "generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means[.]" *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).  "[C]ivil conspiracy 'came to be used to extend liability in tort ... beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'" *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS §46 at 293 (1971)).  "Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Id.*at 926 (quoting *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)).

Here, the district court did not dispute that a conspiracy claim may be based on a party's breach of fiduciary duties and knowing participation in breaches of fiduciary duties.  There are many cases recognizing that type of claim.  *See, e.g., Matter of Alabama & Dunlavy, Ltd.*, 983 F.3d 766, 777 (5th Cir. 2020); *Davis v. Crawford*, 700 S.W.3d 438, 449-50 (Tex. App.—Eastland 2024, no pet.); *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 446-48 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).  However, the district court rejected Providence's civil conspiracy

56

claim by citing *Crossroads*, which is discussed above, as its primary authority. ROA.11393-11394.  Because the district court's summary judgment on knowing participation should be reversed (as discussed above), the district court's civil conspiracy decision must also be reversed.

## **CONCLUSION**

The district court's summary judgment should be reversed and the case remanded for trial.

Respectfully submitted,

*/s/ W. Scott Hastings*

W. Scott Hastings
  State Bar No 24002241
  scott.hastings@troutman.com
Seth M. Roberts
  State Bar No. 24051255
  seth.roberts@troutman.com
Thomas F. Loose
  State Bar No. 12561500
  tom.loose@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

**COUNSEL FOR APPELLANT**
**PROVIDENCE TITLE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2025, I filed the Corrected Brief of Appellant Providence Title Company through the Fifth Circuit's CM/ECF filing system to all counsel of record.


*/s/W. Scott Hastings*
W. Scott Hastings

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of <u>Fed. R. App. P. 32(a)(7)(B)</u> because this brief contains 12,809 words, excluding parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ W. Scott Hastings*
W. Scott Hastings

August 4, 2025